# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00622-CR

**Robin A. Bailey, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT
### NO. 52,406, HONORABLE C. W. DUNCAN, JR., JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Robin A. Bailey guilty of first-degree felony theft and misapplication of fiduciary property. Tex. Pen. Code Ann. §§ 31.03(a), (e)(7); 32.45(b), (c)(7) (West 2003). The court sentenced her to five years' imprisonment for each offense. She brings forward two issues or points of error claiming that the evidence is legally and factually insufficient to sustain the convictions. We will affirm the theft conviction, render judgment convicting appellant of the lesser offense of second-degree felony misapplication, and remand the cause for reassessment of punishment for the latter offense.

### *Background*

Appellant was accused of stealing and misapplying property belonging to Marguerite Norman. At the time of trial, Norman was ninety-nine years old, living in a nursing home, and

incompetent to testify. Norman was the widow of Hugh Thomas Barr, her first husband, and Harold Norman, her second husband. She was the mother of three children: T. H. Barr, who died in 1966, Dred Barr, who died in 1994, and Billye Barr Hall, her only daughter. Dred Barr was married to Mary Ann Barr. Appellant is Mary Ann's daughter by a previous marriage.

Before being moved to the nursing home, Norman lived in a house on Trimmier Road in Bell County. Her house was connected by a covered breezeway to a second, larger house which was originally the home of Dred and Mary Ann Barr. Until 1998, Norman owned both houses and the lot on which they sit, as well as approximately fifty acres of adjoining undeveloped land. Dred and Mary Ann looked after Norman for over twenty years. During this time, Norman maintained two checking accounts: one in her name and Dred Barr's name (the "Norman/Dred Barr account"), and one in her name and Mary Ann Barr's name (the "Norman/Mary Ann Barr account"). Mary Ann made most of the deposits to and wrote most of the checks on these accounts. Mary Ann paid Norman's bills, made purchases as requested by Norman, and otherwise looked after Norman's financial affairs.

Appellant and her husband, Joseph Bailey, began living with Mary Ann Barr on Trimmier Road after Dred Barr's death in 1994. In November 1996, Mary Ann remarried and moved out of the house. Appellant, Joseph, and their children continued to live on the property with Norman. Although Mary Ann lived nearby and continued to pay Norman's bills for a time, appellant gradually assumed that responsibility. In November 1997, Mary Ann returned to the Trimmier Road house with her new husband, Joe Work. That same month, Norman fell and broke her arm. The evidence shows that she recovered from this accident physically but never recovered mentally.

2

In July 1997, a checking account in the names of Norman and appellant Robin Bailey was opened at National Bank in Killeen (the "Norman/Bailey account"). From the date it was opened and May 1999, almost $280,000 was deposited into this account. Nevertheless, by July 1999, the account was overdrawn, and for the next year the balance in the account never exceeded a few hundred dollars. We will discuss this account in greater detail when we address appellant's points of error.

In July 1998, Norman signed a deed transferring title to her undeveloped Trimmier Road real estate to appellant and her husband. The evidence shows that this property was then worth $262,000. This transaction will also be discussed more thoroughly later in this opinion. One month later, Norman signed a second deed transferring title to the Trimmier Road residences, valued at $209,000, to appellant and Joseph Bailey.

Norman broke her hip in March 2000. Upon her release from the hospital, she was moved to a nursing home on her doctor's recommendation. Billye Barr Hall subsequently learned that Norman had no money to pay the nursing home. She also learned that Norman's real estate had been deeded to appellant and Joseph Bailey. Hall was appointed Norman's guardian in September 2000, after Norman was diagnosed with dementia probably resulting from Alzheimer's disease.

*Alleged Errors and Standards of Review*

The indictment alleged that appellant misapplied (count IA) and stole (count IIA) over $200,000 from Norman by means of transactions involving the Norman/Bailey account. The indictment further alleged that appellant misapplied (count IB) and stole (count IIB) Norman's undeveloped Trimmier Road real estate. The two theories of each offense were submitted to the jury

in the alternative, and the jury returned general verdicts of guilty. *See Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991). Appellant contends the evidence is legally and factually insufficient to sustain these verdicts.

In a legal sufficiency review, the question is whether, after viewing all the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Griffin v. State*, 614 S.W.2d 155, 158-59 (Tex. Crim. App. 1981). A factual sufficiency review asks whether a neutral review of all the evidence, both for and against the finding of guilt, demonstrates that the proof of guilt is either so obviously weak or so greatly outweighed by contrary proof as to undermine confidence in the jury's determination. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).

## *Theft*

### Count IIB: Real Estate

In April 1997, when she was ninety-three, Norman executed a new will leaving the Trimmier Road residence to Mary Ann Barr and appellant, and the remainder of her real estate to Billye Barr Hall and Mary Ann Barr. In July 1998, however, appellant went to a different attorney and requested the preparation of a deed transferring the undeveloped Trimmier Road property to appellant. She told Paulette Castillo, a legal assistant employed by the attorney, that Norman had been compelled to sign a will that she did not want and that Norman wanted the property to belong to appellant. After the deed was completed, appellant returned to the lawyer's office with Norman. Norman did not leave her car. Instead, Castillo brought the deed to the car for Norman to sign.

Norman examined the deed and stated that she also wanted "Joe's name" to be added. The deed was immediately revised to make both Robin Bailey and Joseph Bailey the transferees, and it was signed by Norman that same day. As previously noted, the undeveloped Trimmier Road property was worth $262,000 in July 1998. The following year, appellant and Joseph sold a 14-acre portion of this property for $117,600.

Appellant argues that the State failed to prove that she appropriated the Trimmier Road real estate without Norman's effective consent.[1] The jury was instructed that consent is not effective if: (1) induced by deception or coercion; (2) given by a person who by reason of youth, mental disease or defect, or intoxication is known by the actor to be unable to make reasonable property dispositions; or (3) given by a person who by reason of advanced age is known by the actor to have a diminished capacity to make informed and rational decisions about the reasonable disposition of property. Tex. Pen. Code Ann. § 31.01(3)(A), (C), (E) (West 2003).

Castillo, the legal assistant, testified that she was convinced that Norman understood the nature of the July 1998 land transaction and was competent to enter into it. Julia Morris, the bank employee who opened the Norman/Bailey account in July 1997, testified that she saw nothing at that time that caused her to doubt Norman's competence. Another witness, Deborah Mendenhall, testified that she had known Norman her entire life and visited Norman weekly for many years. Mendenhall said she never noticed any mental decline, even after Norman moved to the nursing home.

---

[1] Theft is the unlawful appropriation of property with the intent to deprive the owner of the property. Tex. Pen. Code Ann. § 31.03(a) (West 2003). Among other things, "appropriate" means to bring about a transfer of title to property. *Id*. § 31.01(4)(A). Appropriation is unlawful if it is without the owner's effective consent. *Id*. § 31.03(b)(1).

Most of the witnesses, however, were of the opinion that Norman experienced a decline in her mental faculties in her nineties, although they did not agree as to the extent or exact nature of the decline. Norman fell and broke her arm in November 1997, and for several weeks thereafter, doctors feared that she would not live. Billye Barr Hall testified that Norman recovered physically, but not mentally, after she returned home from the hospital. Hall said that after breaking her arm, Norman was unable to carry on extended conversations and would "drift off into something that didn't make any sense at all." Hall also reported hearing her mother talking to her late husband.

Joe Work, who had known Norman for many years and who married Mary Ann Barr in 1997, also testified that Norman "never regained the [mental] sharpness" she had before breaking her arm. He testified that by 1999, Norman was "a shadow of what she was when I first met her." He said that Norman began seeing things, and became afraid to watch television or look in a mirror.

In April 1999, Norman's family physician referred her to Dr. Richard Lenehan, a neurologist at Scott and White Hospital. According to Lenehan's written report, Mary Ann Barr told him that Norman had experienced "a gradual decline as far as her ability to carry out activities of daily living." Mary Ann also reported that during the previous six months, Norman had experienced serious memory loss and was having delusions and hallucinations. Based on the reported history, his own examination, and test results, Lenehan concluded that Norman had severe dementia, probably resulting from Alzheimer's disease. Given the degree of cognitive impairment Norman exhibited at the time he examined her, Lenehan believed that her decline had begun several years before.

Lenehan reaffirmed his written diagnosis in his trial testimony. He said that Norman's dementia would have been moderate in 1996, worsening to severe by 1997. He was of

6

the opinion that Norman would not have been able to make rational decisions regarding transactions in 1997, even though she might have appeared normal to a layperson at that time.

Dr. Richard Coons, a psychiatrist, also testified. Coons had not examined Norman but had reviewed her medical records from 1997 through 2000, including Lenehan's report. Coons stated that his review of the records led him to agree with Lenehan that in April 1999, Norman had severe dementia of the Alzheimer's type. Coons was of the opinion that Norman lacked the capacity to make rational decisions as early as 1997, after she broke her arm.

The defense called its own psychiatric expert, Dr. Robert Cantu, who also based his testimony on a review of Norman's medical records. Although Cantu agreed with Lenehan and Coons that Norman had Alzheimer's dementia, he was of the opinion that this dementia was much less severe than they believed. Cantu opined that, as of April 1999, Norman suffered from mild dementia complicated by temporary periods of overlying delirium. Cantu attributed the family's reports of hallucinations to these periods of delirium. Cantu was reluctant to express an opinion as to Norman's capacity in 1997 to make informed decisions regarding the disposition of her property, but he conceded that a person with even mild dementia might not be competent in that respect.

Jean Gautier was a member of Norman's church who visited her periodically between 1995 and 1999. She described a gradual decline in Norman's mental acuity during these years. In late 1999, at the time of her last visit, Gautier found Norman sitting alone and unresponsive in a dark room. Gautier believed that Norman did not recognize her at that time.

The evidence summarized above is both legally and factually sufficient to support the conclusion that in July 1998, when she signed the deed transferring her Trimmier Road real estate to appellant and Joseph Bailey, Norman was unable to make informed and rational decisions about

7

the reasonable disposition of property because of advanced age, mental disease, or both. We do not understand appellant to argue otherwise. Instead, appellant argues that the evidence does not support the conclusion that she *knew* that Norman was unable to give effective consent.

Appellant began living on Trimmier Road in 1994, and it was undisputed that she thereafter had daily contact with Norman. Appellant became Norman's primary caregiver in 1996 after her mother, Mary Ann Barr, remarried. Two witnesses, Billye Barr Hall and Joe Work, testified to Norman's obvious mental decline after she broke her arm in 1997. Norman's mental condition was sufficiently impaired by April 1999 that she was referred to a neurologist for an examination. The neurologist was told that Norman had been experiencing memory loss, delusions, and hallucinations during the year prior to the referral, and had lost much of her mental ability to carry out her daily activities. Although other witnesses testified that Norman seemed competent and lucid until much later, the jury was in the best position to judge the credibility of the various witnesses and to resolve the conflicts in the testimony.

Viewing all the evidence in the light most favorable to the verdict, a rational trier of fact could find beyond a reasonable doubt that in July 1997, when she arranged for Norman to sign a deed giving her and Joseph Bailey title to the Trimmier Road property, appellant knew that Norman was not able to make reasonable property dispositions because of mental disease or advanced age. Viewing all the evidence in a neutral light, the evidence supporting the inference that appellant was aware of Norman's diminished mental capacity is neither so obviously weak nor so greatly outweighed by contrary proof as to undermine confidence in the jury's determination. We therefore conclude that the evidence is legally and factually sufficient to prove that appellant brought about the transfer of title to the Trimmier Road real estate without Norman's effective consent. We

overrule appellant's second point of error insofar as it challenges her conviction for theft under count IIB of the indictment.

### Count IIA: Bank Account

Appellant also contends the State failed to prove that she appropriated the funds in the Norman/Bailey account without Norman's effective consent. Because we hold that the evidence supports appellant's conviction for theft pursuant to count IIB, we need not decide if the evidence also supports a conviction on count IIA. *See Kitchens*, 823 S.W.2d at 258.

## Misapplication of Fiduciary Property

### Count IB: Real Estate

In count IB, the indictment alleged that appellant held the Trimmier Road real estate as a fiduciary on Norman's behalf, and that by deeding and transferring ownership of the property to herself and Joseph Bailey in July 1998, appellant dealt with the property in a manner contrary to the agreement under which she held the property and that involved a substantial risk of loss to Norman.[2] Appellant contends the evidence is legally and factually insufficient to prove that the transfer of title violated any agreement with Norman, and that the evidence is factually insufficient to prove that Norman did not benefit from the transaction.

---

[2] "A person commits an offense if he intentionally, knowingly, or recklessly misapplies property he holds as a fiduciary . . . in a manner that involves substantial risk of loss to the owner of the property or to a person for whose benefit the property is held." Tex. Pen. Code Ann. § 32.45(b) (West 2003). "'Misapply' means deal with property contrary to an agreement under which the fiduciary holds the property." *Id*. § 32.45(a)(2)(A).

9

We agree that the evidence does not support a conviction on count IB, but for a reason more fundamental than those advanced by appellant. Simply stated, the evidence before us fails to show that appellant held the Trimmier Road real estate in any capacity, fiduciary or otherwise, at the time of the challenged transaction. To the contrary, Norman alone held title to the property until the July 1998 deed was executed, and it was Norman, not appellant, who signed the deed transferring title to appellant and Joseph. No rational trier of fact could find that appellant misapplied fiduciary property by deeding the Trimmier Road real estate to herself as alleged in the indictment.

Certainly, appellant took advantage of Norman's trust by deliberately inducing the incompetent Norman to sign the deed giving appellant title to the property. But this conduct constituted only theft. The evidence is legally insufficient to sustain the jury's finding that the 1998 real estate transaction was a misapplication of property held by appellant as Norman's fiduciary. We sustain appellant's first point of error insofar as it challenges her conviction for misapplication of fiduciary property under count IB of the indictment.

*Count IA: Bank Account*

Appellant makes the same arguments with respect to count IA of the indictment that she made with respect to count IB. She contends the evidence is legally and factually insufficient to prove that she dealt with the money in the Norman/Bailey account in a manner contrary to any fiduciary agreement by which she held the property, and factually insufficient to prove that Norman did not receive the benefit of the challenged transactions.

Prior to July 1997, Norman maintained two checking accounts: the Norman/Mary Ann Barr account at First National Bank in Killeen, and the Norman/Dred Barr account at National

10

Bank in Killeen. In July 1997, Norman signed a check for $42,243.66 on the former account. This money, less $1000 retained as cash, was used to open the Norman/Bailey account. In January 1998, Norman signed a check for $42,000 written on the Norman/Dred Barr account. Appellant deposited this money, less $2000 retained as cash, in the Norman/Bailey account on January 16, 1998. The two Norman/Barr accounts remained open but inactive, with balances of less than $1500.

Norman also owned five certificates of deposit. One month after the Norman/Bailey account was opened, a $50,000 certificate of deposit in the names of Norman and Mary Ann Barr matured and was not renewed. This money, less $22,000 which is not entirely accounted for by the evidence, was deposited in the Norman/Bailey account on August 29, 1997. In August 1998, another $50,000 certificate of deposit, apparently held in Norman's name alone, was closed and the money, less a penalty for early withdrawal, was deposited in the Norman/Bailey account. In December 1998, a $50,000 certificate of deposit in the names of Norman and Mary Ann Barr matured, and the money, less $5000 which is not accounted for by the evidence, was deposited in the Norman/Bailey account. Finally, in April 1999, a $50,000 certificate of deposit in the names of Norman and Billye Hall was closed and the money, less $4500 retained as cash by appellant, was deposited in the Norman/Bailey account.

In addition to the deposits detailed above, numerous smaller deposits totaling less than $30,000 were made into the Norman/Bailey account through August 2000. These represented Social Security payments to Norman, interest payments from certificates of deposit, and the like. Norman's fifth certificate of deposit, containing about $42,000, was never closed, but it was used as collateral for a loan to appellant.

11

The indictment listed 143 individual transactions between August 1997 and August 2000 by which it was alleged that appellant misapplied a total of $245,597.40 in currency she held in a fiduciary capacity in the Norman/Bailey account. These transactions included amounts withheld from deposits, cash withdrawals, direct transfers from the Norman/Bailey account to other accounts at National Bank, and checks drawn on the Norman/Bailey account. Account records introduced in evidence show other transactions totaling approximately $89,000 that were not alleged in the indictment.[3] Most of the checks drawn on the Norman/Bailey account, and all of the checks alleged in the indictment, were signed by appellant.[4]

Appellant first argues that the evidence is legally and factually insufficient to support a finding that a fiduciary agreement existed between Norman and herself with respect to the funds held in the Norman/Bailey account. Specifically, appellant urges that the State was required to prove that there was an express agreement governing her dealings with the alleged fiduciary property.

An agreement, within the meaning of section 32.45, is "a harmonious understanding or . . . arrangement . . . between two or more parties, as to a course of action." *Bynum v. State*, 767 S.W.2d 769, 777 (Tex. Crim. App. 1989). The agreement need not be in writing. *Id*. Moreover, and

---

[3] According to a witness, these unalleged transactions were checks payable to "[v]arious vendors, utilities, groceries, Wal-Mart, various normal . . . type spending that one would spend to . . . supporting [sic] their family, clothing their family, feeding their family."

[4] Although she does not expressly challenge the sufficiency of the evidence in this respect, appellant refers in her brief to "conclusory" statements by a witness that appellant wrote the checks in question. Bank records in evidence show that all of the checks, and most of the cash withdrawals, bear the signature of "Robin Bailey." The jury could compare this signature to the signature on checks written on accounts belonging to appellant, which were also in evidence. Appellant did not deny writing the checks in question. *See* Tex. Code Crim. Proc. Ann. art. 38.27 (West 1979). To the contrary, it was appellant's contention at trial that she was authorized to make the transactions on which the prosecution was based.

12

contrary to appellant's argument, the agreement need not be proved directly but can be inferred from the circumstances. *Id.*

The evidence shows that all of the money deposited into the Norman/Bailey account belonged to Norman, although some of the money had been held in joint checking accounts or certificates of deposit with other family members. Mary Ann Barr testified that while she routinely wrote checks on the Norman/Barr accounts, the money in those accounts was Norman's and was used solely to pay Norman's personal expenses or as otherwise directed by Norman. Mary Ann testified that it never occurred to her to use the money in the Norman/Barr accounts for her own benefit. Mary Ann also testified that after she remarried and moved out of the house in November 1996, she continued to write checks for Norman for several months. In July 1997, however, Mary Ann noticed that the new Norman/Bailey account had been opened, and Mary Ann was no longer asked to write checks for Norman. Appellant took over this responsibility, and she thereafter paid all of Norman's bills and otherwise handled her financial affairs. Viewing this evidence and all the other circumstances in the light most favorable to the verdict, we hold that the jury could reasonably infer beyond a reasonable doubt that there was a harmonious understanding or arrangement between appellant and Norman by which appellant held the money in the Norman/Bailey account for Norman's use and benefit. Moreover, the evidence supporting this inference is neither so weak nor so outweighed by contrary proof as to undermine confidence in the jury's determination. Appellant's assertion that a fiduciary agreement was not proved is without merit.

Appellant's second argument is that the evidence is factually insufficient to prove that Norman did not benefit from the transactions alleged in the indictment. Another way of stating this contention is that the State failed to prove that appellant dealt with the money in the Norman/Bailey

13

account in a manner contrary to the agreement under which she held the property. *See* Tex. Pen. Code Ann. § 32.45(a)(2) (defining "misapply"). As we will explain, we conclude that the State failed to prove that appellant misapplied over $200,000 from the Norman/Bailey account, but the evidence is sufficient to prove a misapplication of more then $100,000.

The State introduced bank records from the two Norman/Barr accounts and the Norman/Bailey account. Records from two accounts not previously mentioned in this opinion were also introduced in evidence: a checking account at National Bank in the names of Joseph Bailey and Robin Bailey (the "Joseph Bailey account") and a second National Bank checking account in the names of Robin Bailey and Joseph Bailey (the "Robin Bailey account"). Finally, the State introduced the records concerning Norman's bank certificates of deposit. Ruthie Bryant, a certified public accountant, was the State's primary witness regarding the bank records.

Bryant testified that she had examined the bank records and determined that Mary Ann Barr wrote checks on the Norman/Barr accounts totaling approximately $17,000 during the year preceding the opening of the Norman/Bailey account. This was an average of about $1400 in checks each month. During the last five months of 1997, appellant wrote checks totaling over $19,000 on the Norman/Bailey account. For the year 1998, appellant wrote checks totaling $58,800, or an average of $4900 per month, on the Norman/Bailey account. By comparing Mary Ann's spending (which she referred to as the "basic maintenance rate") to appellant's, Bryant concluded that appellant had made more than $100,000 in "excess disbursements." The State's burden, however, was not to prove that appellant spent too much of Norman's money in general. Instead, it was the State's burden to prove that appellant misapplied fiduciary property by engaging in the 143 specific transactions listed in count IA of the indictment. Bryant's testimony comparing appellant's spending

14

with Mary Ann's was not probative in this respect because it included checks appellant drew on the Norman/Bailey account that were not alleged in the indictment.

Bryant also testified that between 1997 and 2000, appellant and her husband wrote checks on their own joint accounts in amounts far exceeding their reported wage incomes for those years. While this testimony suggests that the Baileys had sources of income other than their wages, it does not tend to prove that the 143 transactions alleged in the indictment were misapplications of Norman's property. Similarly, testimony that, during the period in question, appellant and her husband purchased horses, a trailer, and a swimming pool does not, in itself, prove that any of the transactions alleged in the indictment were criminal. The State offered no evidence that these items were paid for with money taken from the Norman/Bailey account.

In order to determine which, if any, of the 143 alleged transactions constituted a misapplication of fiduciary property, we have categorized the transactions by type and examined the bank records with respect to each. We will now summarize what the record shows with respect to each category.

**Cash withheld from deposits.** The indictment alleged that appellant misapplied $26,500 withheld from two deposits made into the Norman/Bailey account. The first of these deposits was made on August 29, 1997, after Norman did not renew a $50,000 certificate of deposit. This money, less $22,000, was deposited into the Norman/Bailey account for a net deposit of $28,000. Although the indictment alleged that appellant misapplied the entire $22,000 withheld, the deposit slip in evidence shows that $5000 of this amount was deposited into another bank account for which no records are in evidence and that only $4000 was taken as cash; the exhibit is illegible

with respect to the disposition of the remaining $13,000. Bank records also show a $3000 deposit into the Joseph Bailey account on that same day.

On April 27, 1999, another $50,000 certificate of deposit belonging to Norman was closed and the proceeds, less $4500 in cash, were deposited into the Norman/Bailey account. The deposit slip shows that appellant signed for the cash. Other bank records show that one week later, appellant deposited $4500 into the Robin Bailey account.

Looking at the evidence in the light most favorable to the verdict, the jury could rationally find beyond a reasonable doubt that by depositing money belonging to Norman into her own accounts, appellant dealt with the property in a manner contrary to her fiduciary agreement. The evidence regarding these two transactions is therefore legally sufficient to support a finding that appellant misapplied $7500 withheld from deposits into the Norman/Bailey account. Absent any evidence regarding the use or disposition of the remaining amounts withheld, however, the evidence is legally insufficient to support a finding that this money was misappropriated.

**Cash withdrawals.** The indictment alleged that ten transactions in which appellant withdrew $72,358 in cash from the Norman/Bailey account were misapplications of fiduciary property. The first withdrawal was made on January 22, 1998, when appellant withdrew $1000 from the Norman/Bailey account. That same day, appellant deposited $1000 into the Joseph Bailey account. Appellant made two more withdrawals from the Norman/Bailey account on January 26, 1998: one for $2500 and the other for $61,108. On the same day, a deposit of $2500 was made into the Joseph Bailey account, and a deposit of $61,108 was made into the Robin Bailey account. Viewing this evidence in the light most favorable to the verdict, we hold that it is legally sufficient

16

to support a finding that appellant misapplied $64,608 she withdrew from the Norman/Bailey account and deposited into her own accounts.

The seven additional cash withdrawals total $7800.[5] Although the evidence shows that appellant made the withdrawals, there is no direct or circumstantial evidence regarding what she did with the money. Absent any evidence that appellant dealt with this money in a manner contrary to her fiduciary agreement, we hold that the evidence is legally insufficient to support a finding that this $7800 was misapplied.

**Transfers to other accounts.** The indictment alleged that appellant misapplied a total of $14,900 transferred directly from the Norman/Bailey account to either the Joseph Bailey account or the Robin Bailey account.[6] Bank records introduced in evidence confirm that these transfers were made as alleged. This evidence is legally sufficient to support a finding that appellant misapplied $14,900 transferred from the Norman/Bailey account into her own accounts.

**Checks written to cash.** Included in the transactions alleged to be misapplications of fiduciary property were forty-six checks totaling $62,941 drawn by appellant on the Norman/Bailey account and made payable to cash. With respect to sixteen of these checks, totaling $35,700, bank records show that on the same day, or the day after, they were written, deposits of the same amount were made into one or the other of the two accounts owned by appellant and Joseph

---

[5] These withdrawals were made on June 4 and 17, 1998; July 2, 17, 22, and 30, 1998; March 17, 1999; and July 30, 1999.

[6] These transfers took place on April 29, 1998; July 6, 1998; March 17 and 24, 1999; and April 30, 1999. The bank records show twenty other transfers, totaling $44,400, from the Norman/Bailey account into appellant's accounts. These transfers were not alleged to be misapplications.

17

Bailey.[7]  This evidence, viewed in the light most favorable to the verdict, is legally sufficient to support a finding that appellant misapplied this $35,700.  There is no evidence showing the disposition of the remaining $27,241, and thus the evidence is legally insufficient to support a finding that this amount was misapplied by appellant.

In addition to the checks made payable to cash, appellant wrote three other checks to unnamed payees.[8]  Bryant testified that she assumed that these checks, for $700, $113.74, and $400, were for cash.  Although the indictment alleged that these checks constituted misapplications of fiduciary property, the State offered no evidence to show how the money was used by appellant.  We hold that the evidence is legally insufficient to support a finding that appellant misapplied this $1213.74.

**Checks written to named payees.**  The remaining transactions alleged to be misapplications of fiduciary property held in the Norman/Bailey account were checks written by appellant to various named payees.  These checks total $69,435.77.

On December 18, 1997, appellant wrote a check payable to Joe Bailey for $1000.  The same day, $1000 was deposited into the Joseph Bailey account.  Appellant wrote two more checks to Joe Bailey, both for $1500, on November 21, 1997, and January 24, 1998.  There is no evidence regarding the purpose or disposition of these two checks.  Viewing these three transactions in the light most favorable to the verdict, the jury could rationally find that appellant misapplied $1000.

---

[7] The sixteen checks were dated September 18, 1997; October 28, 1997; November 18 and 20, 1997; December 1, 7, 13, and 22, 1997; January 2, 15, 22, and 26, 1998; May 6, 1999; June 4, 1999; July 9, 1999; and December 6, 1999.

[8] These checks were dated August 11, 1998; October 2, 1998; and June 9, 2000.

On June 4, 1999, appellant wrote a check for $5000 payable to herself. That same day, $5000 was tendered for deposit into the Robin Bailey account. Applying the legal sufficiency standard, the jury could rationally find that this constituted a misapplication of fiduciary property.

On September 25, 1997, appellant wrote a check for $1000 payable to National Bank. The next day, a $1000 check was included in a deposit into the Joseph Bailey account. On October 1, 1997, appellant wrote another check payable to National Bank, this one for $1800. The same day, an $1800 check was deposited into the Joseph Bailey account. A $5000 check payable to National Bank corresponds with a deposit of the same amount into the Robin Bailey account; both check and deposit were dated October 5, 1998. A fourth check payable to National Bank, for $350 and dated April 16, 1999, corresponds to a $350 deposit into the Robin Bailey account on April 19, 1999. We conclude that the evidence of these four transactions, when viewed in the light most favorable to the jury's verdict, is legally sufficient to support a finding that appellant misapplied $8150 from the Norman/Bailey account.

Many of the other checks alleged to have been misapplications, which total $55,285.77, were also payable to National Bank. Bryant testified that some of these checks appeared to have been loan payments, but there is no evidence as to who borrowed the money or for what purpose. Other checks payable to National Bank, as well as checks payable to such named payees as Visa, Providian, Chase, and Chase Visa, appear to have been payments for purchases charged to bank credit cards. The State introduced the billing records from two bank credit cards, one issued by Chase to Norman and one issued by National Bank to Norman and appellant. There is no evidence as to who made these charges. Many of the charges reflect purchases from the same

19

merchants to whom appellant wrote checks the State elected not to allege as misapplications.[9] On the other hand, some of the charges are suspicious, such as those for travel expenses that were unlikely to have benefitted Norman given her frail physical condition. The balance of the checks in this category were made payable to various retailers.[10]

In summary, we hold that the evidence is legally sufficient to support a finding that appellant intentionally misapplied $136,858 she held as a fiduciary in the Norman/Bailey account by depositing into accounts she owned with Joseph Bailey: (1) $7500 in cash she withheld from deposits made into the Norman/Bailey account; (2) $64,608 in cash she withdrew from the Norman/Bailey account; (3) $14,900 she transferred from the Norman/Bailey account to her own accounts; (4) $35,700 in checks she drew on the Norman/Bailey account and made payable to cash; and (5) $14,150 in checks she drew on the Norman/Bailey account and made payable to either herself, Joseph Bailey, or National Bank.[11] Even if the remaining checks alleged in the indictment totaling $55,285.77 were also misapplications, a supposition that is not supported by the evidence, the total would be less than $200,000. We therefore conclude that the evidence is not legally sufficient to sustain appellant's conviction for misapplication of more than $200,000 of fiduciary property. The evidence is legally sufficient, however, to support a conviction for misapplication of more than $100,000.

---

[9] See footnote 3, *supra*.

[10] The prosecutor was careful to draw the jury's attention to one of these checks, for $212.17 payable to Victoria's Secret. The goods sold by this merchant are not likely to be worn by a nonagenarian.

[11] Although appellant does not challenge the sufficiency of the evidence as to this element, we also find the evidence legally sufficient to prove that she misapplied the property in a manner that involved a substantial risk of loss to the owner.

Having concluded that the evidence is legally sufficient to support a conviction for the lesser offense, we turn to appellant's contention that the evidence is factually insufficient to sustain a conviction for misapplying fiduciary property under count IA. Appellant refers us to evidence that Norman was a generous woman and had given many gifts (both property and cash) to her children and grandchildren over the course of her life. Appellant argues that the State failed to prove that the transactions alleged by the State to have been misapplications of fiduciary property were not, in fact, gifts by Norman to appellant.

Viewing all the evidence in a neutral light, including the evidence of Norman's past generosity, we conclude that the evidence we have found legally sufficient to support a conviction for misapplication of more than $100,000 of fiduciary property is neither so obviously weak nor so greatly outweighed by contrary proof as to undermine confidence in the jury's determination. We overrule appellant's contention in her first point of error that the evidence is factually insufficient to support a conviction under count IA of the indictment.

## Conclusion

We affirm the district court's judgment convicting appellant on count II of the indictment for theft of real property having a value exceeding $200,000. We modify the judgment convicting appellant on count I to reflect a conviction for misapplying more than $100,000 but less than $200,000 of fiduciary property and, as modified, affirm the judgment with respect to appellant's guilt.[12] Although the punishment assessed is within the range prescribed for a second-degree felony,

---

[12] The court's jury charge authorized appellant's conviction for this lesser included offense. *See Collier v. State*, 999 S.W.2d 779, 782 (Tex. Crim. App. 1999).

21

we will not assume that the court would have assessed the same term of imprisonment for the lesser offense. Therefore, we reverse that portion of the judgment on count I imposing sentence and remand the cause to the district court for reassessment of punishment for the misapplication offense. *See* Tex. Code Crim. Proc. Ann. art. 44.29 (West Supp. 2003).

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed in Part; Modified and, as Modified, Affirmed in Part; Reversed and Remanded in Part

Filed:  December 4, 2003

Do Not Publish